## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **JOHNSON INVESTMENT COUNSEL, INC., Individually and on Behalf of all Others Similarly Situated,** | : : : | **Civil Action No. _____** |
| | : | **Judge: _____** |
| **Plaintiff,** | : | |
| **vs.** | : | |
| | : | **CLASS ACTION COMPLAINT FOR** |
| **BP, PLC; BP AMERICA, INC.;** | : | **VIOLATIONS OF FEDERAL** |
| **ANTHONY HAYWARD; ANDY** | : | **SECURITIES LAWS** |
| **INGLIS; CARL-HENRIC SVANBERG;** | : | |
| **AND H. LAMAR MCKAY** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |

## INTRODUCTION

1.      This is a securities fraud class action on behalf of the purchasers of the publicly-traded American Depository Receipts ("ADRs") of BP, plc ("BP" or the "Company") from March 4, 2009 to June 1, 2010 (the "Class Period"), who were damaged thereby.  Throughout the Class Period, Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),  and Rule 10b-5 promulgated thereunder, by making false and misleading statements and material omissions concerning the safety protocols, operations and safety record of BP.

2.      The deceptive statements and reckless omissions from BP's spokespersons as detailed in this Complaint amply demonstrate that BP's procedures for minimizing its financial losses from drilling rig problems were no more than fantasies.  According to reports on May 28, 2010 by the Wall Street Journal, but never publicly disclosed by BP, BP's highly touted safety

procedures completely failed and led to catastrophic loss of life and assets.  BP never disclosed to the investing public that its safety procedures had never been tested for conditions detailed in this Complaint.  BP never disclosed to the investing public that the safety procedures that existed created a broken and confusing chain of command.  BP never disclosed that its operating procedures permitted the assignment of inexperienced senior personnel to be in charge of final well tests.  BP was simply not the enterprise that its public communications pictured.  The securities trading market place has recognized BP's deceptions by a catastrophic drop in BP's share price during the Class Period from a high of $62 to a low of $42.56 as of the close of trading on May 25, 2010.

3.      Defendants' fraud led to one of the worst oil spills in U.S. history after the catastrophic explosion, fire and resulting sinking of the *Deepwater Horizon* (the "*Horizon*") oil drilling rig leased and operated by BP, leaving 11 men dead, contaminating over 4,000 square miles of marine life, and causing billons of dollars in harm to BP and its investors.

4.      On April 20, 2010, the day of the *Horizon* explosion, BP ADRs closed at $59.49 a share.  BP still has not revealed the full effect of the financial calamity it is facing.  When the size of the spill was announced and the investing public realized that BP could not control the spill, the market price of BP plummeted nearly 10% to $52.00 per share, causing a one day loss on April 29, 2010 to BP investors of over $ 15 billion.  But the full scope of the catastrophe was not completely disclosed.  Two weeks thereafter, BP announced that its efforts to close the well were, using some techniques, no better than 50%.  When the market, on May 19 and 20, realized that BP's previous assurances about its safety practices and technology were false, the price of BP's shares fell further reaching a low of $42.56 per share on May 25, 2010.  From April 20,

2010 through May 25, 2010, BP's share price dropped over 30% causing a market capitalization loss to BP shareholders of over $56 billion.

5.    On April 20, 2010, an explosion or explosions on *Horizon* caused a fire that severely damaged and eventually sunk the *Horizon*, which had been drilling on the outer Continental Shelf approximately 41 miles offshore from Louisiana.  According to experts and verified from eyewitness statements to the U.S. Coast Guard, the explosion resulted from inadequate safety procedures and faulty cementing over the drilling well.  Based upon its investigations, the Coast Guard designated BP as a responsible party under the Oil Pollution Act of 1990, which provides a strict-liability scheme for payment of removal costs and damages resulting from a discharge of oil from a facility into waters of the U.S., including the area in which the *Horizon* explosion, fire and oil spill occurred.

6.    As a result of the fire and the explosion on the *Horizon*, eleven crew members lost their lives and seventeen others were injured.  Additionally, the subsequent failure of *Horizon*'s safety procedures and mechanisms, including the blowout preventer ("BOP"), led to a massive oil spill which covers an estimated surface area of at least 2,500 square miles.  Estimates are that the oil spill is currently discharging over 5,000 barrels of crude oil – equivalent to over 200,000 gallons – **each day**.  Reports suggest that these estimates are woefully low, and that the actual flow could be as great as 100,000 barrels a day.  The disaster has become the worst oil spill in U.S. history – far worse than the 1989 Exxon Valdez oil spill.  The ever-growing oil spill has already caused serious and permanent environmental damage to the Louisiana coast, with detrimental effects upon the Gulf of Mexico's and Louisiana's marine environments, coastal environments and estuarine areas.  Defendants' acts and omissions as described herein has subjected the Company to significant liability, including current investigations by the U.S.

Departments of Justice, Homeland Security and Interior, the Environmental Protection Agency, the National Oceanic and Atmospheric Administration, the Coast Guard, and various committees and subcommittees of Congress. The Company has also been subjected to numerous civil lawsuits related to the catastrophic disaster and safety failures.

7.     Throughout the Class Period, Defendants touted the growth potential of BP's Gulf of Mexico operations and falsely highlighted the alleged safety of its Gulf operations, convincing investors, including Plaintiff, that BP would be able to generate tremendous growth with *minimal risk*.

> "No activity **is so important that it cannot be done safely...** Simply obeying safety rules is not enough."
>
> -     **BP** (2005)

Indeed, BP repeatedly publicly extolled and misrepresented its safety measures and risk management to the investing public. For example, BP's Code of Conduct, which is available publicly on its website, in a section entitled, "Health, safety, security and the environment" states:

> *At BP our aspirations are - no **accidents, no harm to people and no damage to the environment.***
>
> *We are committed to the protection of the natural environment, to the safety of the communities in which we operate, and to the health, safety and security of our people.*
>
> *Everyone who works for BP, everywhere, has a responsibility for getting HSSE right.*

8.     In its **2009 Annual Report** on Form 20-F, issued on March 5, 2010, a month prior to the *Horizon* disaster, BP stated that:

> "Safety, people and performance are BP's top priorities. We constantly seek to improve our safety performance through the procedures, processes and training programs that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment.'"

In fact, as shown below, this statement was false.  Short-term profits were BP's top priority, and the long-term effect of a lack of safety was a neglected consideration.

9.      BP's share price grew rapidly, nearly doubling in price during the Class Period, trading as high as $61.76 per share on January 19, 2010.

10.     The truth that has recently come to light, however, was that Defendants were cutting corners, reducing BP's spending on safety measures and lobbying state and federal governmental authorities to remove or decrease the extent of safety and maintenance regulation of the Company' Gulf operations - all in an effort to maximize the Company's profits in the Gulf of Mexico.  As Defendants were reassuring the market the Company's operations were safe, effective and improved, BP hid the fact that its safety procedures were deficient and that profits not safety were the top priority for BP, both overall and specific to operations in the Gulf of Mexico.

A.  For example, the *Horizon* had been the site of numerous spills and accidents even before the disaster on April 20, 2010.  During one incident in 2008, 77 people had to be evacuated from the oil rig after it listed and began to sink when a section of pipe was accidentally removed from its ballast system.

B.  In addition, the U.S. Coast Guard had cited the *Horizon* for being an "acknowledged pollution source" 18 times in the past 11 years.  BP did not disclose any of these facts and indeed, *concealed* them from the investing public.

C.  In addition, e-mails and other documents presented to BP senior management discussed serious problems at *Horizon's* sister oil rig, the *Atlantis*.  BP managers on the *Horizon* itself were issuing orders at that time to move faster at the expense of safety, including ignoring the fact that the BOP on the *Horizon* was defective - it was 10 years

old and had not been calibrated, maintained and/or tested appropriately, all which violated Federal requirements.  An example is a recently uncovered e-mail stating:

> **"The current procedures are out of date.** . . Currently there are **hundreds if not thousands of Subsea** documents that have never been finalized, yet the facilities have been turned over . . . . . to Operations."

> - August 15, 2008 e-mail by Barry C. Duff, BP Atlantis Subsea Team Project Manager relating to the Atlantis oil rig which, along with the Deepwater Horizon, operates in the Gulf of Mexico

D.      Time pressure and cost savings overcame safety.  According to company documents reviewed and reported on by the *Wall Street Journal*, the *Horizon* project was months behind its schedule and well over its budgeted costs.  Where BP had anticipated only 51 days from January, 2010 to get the well complete, by April 20, 2010, the well was in its 80th day and the well had not yet been completed.

E.      The BP operating procedures, contrary to its public statements, allowed it to skip critical tests when delays put pressure on completion.   For example, BP's daily drilling reports show that BP didn't run a critical, but time-consuming, procedure that would have allowed the company to detect and remove gas building up in the well.   The fact that BP's confidential policies allowed its employees to ignore BP's own operational standards directly contradicts BP's public statements set forth in this Complaint.

F.      Unknown to the investing public, BP's confidential operational policies permitted the assignment of inexperienced managers to critical tasks.  For example, Robert Laluza, the BP manager responsible for overseeing the final well tests had little if any experience in deep-water drilling.  He told Coast Guard investigators he was on the rig to "learn about deep water".

None of these circumstances was revealed to the public.

11.     As the lessee and owner of the federal permit to drill, BP was the primary operator of the *Horizon* at the time of the incident and the party responsible to make sure that all safety protocols were followed and effective disaster plans were in place.  Adequate and readily available backup safety mechanisms, such as an operational BOP or an acoustically activated remote-control shut-off valve were not installed on the *Horizon*.  In addition, according to one of the workers on the *Horizon*, BP had conducted drilling secretly beyond 22,000 feet even though the federal permit only allowed BP to drill from between 18,000 to 20,000 feet.

12.     On May 3, 2010, BP stated that it was "absolutely **responsible**" for the spill, and for stopping the leak, cleaning up the oil, and any resulting environmental damage.  BP Chief Executive Tony Hayward reiterated BP's acceptance of responsibility for the *Horizon* oil spill.

13.     The event was not an unforeseen accident but was a predictable outcome within BP's offices.  For years, Defendant BP has been engaged in systematic and draconian cost-cutting maneuvers in order to improve profits.  In making those cuts, BP, despite its false public statements, sacrificed safety, choosing to cut corners instead of ensuring that its oil exploration and production business did not cause injury or harm to their own employees, the public, and the fragile Gulf Coast environment.  In 2005, a BP refinery in Texas City, Texas exploded, killing 15 workers (the "Texas City Explosion").  Following the Texas City Explosion, the Company announced that it would address the safety violations that contributed to the deadly explosion.  In 2007, after settling many claims related to the Texas City Explosion, BP's newly appointed Chief Executive Officer, Defendant Hayward, acknowledged that the BP Board and executive were on notice that the Company was operating in a hazardous manner and safety improvements were desperately needed.  At that time, the Company stated, "[o]ur operations failed to meet our own standards and the requirements of the law."  Defendants acknowledged the need to improve

its "risk management" and represented it was implementing major changes to improve its dismal safety record.

14.     Throughout the Class Period, in violation of federal securities laws, BP falsely represented that it had successfully implemented top quality safety mechanisms to prevent catastrophic accidents and was actively monitoring and managing operational risk.  Moreover, BP misled investors saying that its efforts at cutting costs were successful without having an impact on BP's safety.  Given BP's historical safety issues, Defendants' assurances during the Class Period were highly material to investors, since BP's primary financial exposure was from oil exploration accidents and spills. Catastrophic incidents, such as the Texas oil refinery explosion in Texas City in 2005, had previously made a huge impact on BP's finances and share price.

15.     On June 1, 2010, Eric Holder, Attorney General, said that the Justice Department was investigating whether criminal or civil cases were warranted over the spill.  Mr. Holder said: "We will make certain that those responsible clean up the mess they have made and restore or replace the natural resources lost or injured in this tragedy." He added, "And we will prosecute to the full extent any violations of the law."  The Obama Administration called the spill the "the greatest environmental disaster of its kind in our history," and had earlier said it was President Obama's "solemn pledge" to "bring those responsible to justice." Mr. Holder said his department was looking at laying charges under the Clean Water Act, Oil Pollution Act of 1990, the Migratory Bird Treaty Act and Endangered Species Acts, and other "traditional" criminal statutes. "There are a wide range of possible violations under these statutes, and we will closely examine the actions of those involved in this spill. If we find evidence of illegal behaviour, we will be forceful in our response," he said.  The Obama administration already ordered all

companies involved – including BP, Transocean and Halliburton – to preserve documents relating to the incident. Testimony in Congressional hearings has pointed to multiple technical failures before the explosion.

16.     On June 1, 2010, BP experienced its worst one-day trading decline in 18 years, going from a closing price of $42.95 per share on May 28, 2010, down to a closing price of $36.52 per share on June 1, 2010.  BP shares have lost 34% of their value since April 20, 2010.

17.     As a result of Defendants' false and misleading statements that are violations of federal securities laws, Plaintiff and the other members of the class have been damaged by purchasing BP ADRs at artificially inflated prices during the Class Period and by suffering losses when the price of BP's ADRs substantially declined after the revelations of Defendants' fraud.

18. The falsity of BP's safety and preparedness assurances was made clear on June 3, 2010 when Tony Hayward, BP's CEO  admitted to the Financial Times that:

> "What is undoubtedly true is that we did not have the tools you would want in your tool kit"  Financial Times, June 3, 2010 p. 1

19.     According to the Financial Times, he said it was "an entirely fair criticism" to say the company had not been fully prepared for a deep-water oil leak.   Id.

20.     BP also failed to disclose to the investing public that to hurry its Gulf drilling schedule at an unsafe and unproven pace BP had made false and misleading statements to federal authorities in its 2009 exploratory drilling plan submitted to the Mineral Management Services, the U.S. Agency charged with regulating off shore oil drilling.  In that plan, BP stated that it had "proven equipment and technology" to respond to a blowout.   Hayward's June 3, 2010 statements reported by the Financial Times clearly show BP's filings were false.

21. BP's culture of secrecy and public nondisclosure is evidenced in a multitude of false statements and intentional omissions, the most astounding being Hayward's representation to Sky News on May 18, 2010, where he said: "I think the environmental impact of this disaster is likely to have been very, very modest." Similarly he said, according to The Guardian on May 14, 2010:

> "The Gulf of Mexico is a very big ocean. The amount of volume of oil and dispersant we are putting into it is tiny in relation to the total water volume."

## JURISDICTION AND VENUE

22. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Defendant BP conducts business in Louisiana and many of the acts in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District, including the dissemination of materially false and/or misleading information and the omission of material information.

25. In connection with the acts and misconduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

26.     Plaintiff Johnson Investment Counsel, Inc. ("Plaintiff") purchased BP's publicly-traded ADRs during the Class Period as set forth in the attached certification and has been damaged thereby.

27.     Defendant BP, plc ("BP") is a public limited company formed under the laws of the United Kingdom with its principal place of business in the United Kingdom. During the Class Period, BP had approximately 3.1 billion shares outstanding.  Shares of BP and BP ADRs trade on the New York Stock Exchange in an efficient market.

28.     Defendant BP America, Inc. ("BP America") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP America is a subsidiary of BP, plc and conducts substantial business in the State of Louisiana, including leasing and operating the *Horizon*.

29.     BP, plc and BP America, for the activities described herein, acted as one company.  For example, in comments by BP, plc Chief Executive Officer Tony Hayward, in response to Robert Malone retiring as BP America's Chairman and President, said: "Bob Malone has made an extraordinary difference during his tenure at BP America and during his long career at BP. We are a better company because of his ability to connect with the men and women who operate and maintain our facilities and his unflagging commitment to safe operations. All of us at BP appreciate what he has done and wish him well in his next endeavors."  There is a unity of interest and ownership between BP and BP America such that the acts of the one are for the benefit and can be imputed as the acts of the other. Hereinafter, BP, plc and BP America, Inc. are jointly referred to as "BP."

30.     Defendant Anthony B. Hayward ("Hayward") is the Chief Executive Officer and a member of the Board of Directors of BP.  He has served as Chief Executive Officer since 2007 and as an Executive Director since 2003. Before becoming Chief Executive Officer, Hayward, who joined BP in 1982, served as the Chief Executive Officer of Exploration and Production from 2002 to 2007. Hayward received a salary, performance bonus, and other benefits in the amounts of £2,509,000 (over U.S. $4 million) in 2008 and £3,158,000 (over U.S. $4.7 million) in 2009. Hayward is a citizen of the United Kingdom.

31.     Defendant Andy G. Inglis ("Inglis") is an Executive Director and Chief Executive of Exploration and Production. He has worked for BP in various capacities since 1980 and has held his current positions since 2007. Inglis received a salary and performance bonus for the purported success of BP's exploration and production operations.  Inglis is a citizen of the United Kingdom and travels to and from the United States.

32.     Defendant Carl-Henric Svanberg ("Svanberg") is the Chairman of the Board of Directors. He was appointed a Non-Executive Director of BP in September 2009 and became Chairman in January 2010. Svanberg also heads the Chairman's Committee and is a member of BP's Nomination Committee. Svanberg is a citizen of Sweden and travels to and from the United States. By virtue of his position and operational and management control of the committee and systematic involvement in the fraudulent scheme, he had the power to influence and control, and did influence and control, directly and indirectly, the decision-making and actions of BP, including the content and dissemination of the various statements which Plaintiff contends are misleading.

33.     Defendant H. Lamar McKay ("McKay") is Chairman and President of BP America, Inc.  In 1980, McKay started with Amoco, which was acquired by BP in 1998,

occupying a variety of positions until being appointed to his current roles in 2009. McKay is a citizen of Texas.

34.     The individuals identified above are hereinafter collectively referred to as the "Individual Defendants."

## FACTUAL ALLEGATIONS

**A.     BP Responds to Prior Environmental Disasters by Promising, But Not Actually Implementing, Change**

35.     Since 2005, and with major purported changes in 2007, BP aggressively sought to change its public image.  Recognizing BP's poor safety history, CEO Anthony Hayward took over the company in 2007 and launched a campaign to convince the investing public that the company had changed its ways and was conducting its operations in a safe and reliable manner. This response was critical to BP's survival because it had tarnished its reputation by a string of environmental disasters.

36.     At the same time, BP began to describe new areas of oil exploration and production, such as the deepwater Gulf of Mexico and lavishly publicized the ability of BP to extract and produce that oil in an environmentally friendly and safe manner that posed little risk to the company and its shareholders. Plaintiff, relying on BP's misstatements and omissions regarding its ability to drive revenue and profits from its operations in a safe and reliable manner, in particular from the Gulf of Mexico, purchased BP securities and were harmed as a result.

37.     In its 2009 Annual Form 20-F, filed on March 5, 2010, BP stated in a section entitled "Safety" that **"Good progress is being made on underpinning improved** safety performance in **2009. Throughout the year, we continued to focus on training and enhancing procedures across the organization"** and touted the **"continued success of our Gulf of Mexico deepwater operations."**

38.     In that 20-F, while addressing its oil exploration and production operations, including highlighting its deepwater Gulf of Mexico operations, BP falsely stated that, "In Exploration and Production, <u>safety</u>, <u>both</u> <u>personal</u> <u>and</u> <u>process</u>, remains our ***highest priority."*** [Emphasis added.]

39.     While focusing on marketing itself as being able to achieve substantial revenue growth from new oil exploration in the Gulf of Mexico, BP misled investors that it was conducting such operations in a safe manner. At a minimum, investors had no reason to believe that BP's approach to safety in its deepwater Gulf of Mexico operations was so below the standard of care that an accident similar to the *Horizon* was inevitable. This is the type of material information that would have materially affected investor decision-making, especially in light of the high costs of a catastrophic disaster.

40.     Despite its claims about putting "safety first," BP recklessly failed to implement appropriate safety measures. Safety and maintenance problems were endemic throughout BP, including at the *Horizon* oil rig. Moreover, additional safety mechanisms, technologies, and precautions were known and available but BP, in an effort to reduce costs, chose not to employ them on the *Horizon*.  None of these material facts were disclosed during the class periods.

**B.      2005-2008: BP Represents That Past Mistakes Have Been Corrected**

**1.      2005: Texas City Explosion**

41.     On March 23, 2005, the BP Texas City Refinery explosions and fires killed 15 people and injured another 180 resulting in financial losses exceeding $1.5 billion.  The blast occurred during the startup of an isomerization unit (ISOM) when a raffinate splitter tower was overfilled; pressure relief devices opened, resulting in a geyser like flammable liquid from a blowdown stack that was not equipped with a flare. The release of the flammables caused an

explosion and fire. A shelter-in-place order was issued that required 43,000 people to remain indoors and houses were damaged from as far as three-quarters of a mile from the refinery.  The BP Texas City facility is the third-largest refinery in the United States.

42.     After the Texas City Explosion, the US Chemical Safety and Hazard Investigation Board ("CSB") investigated BP's safety performance at Texas City and also the role played by BP Group management, based in London, England. CSB also examined the effectiveness of the Occupational Safety and Health Administration ("OSHA").

43.     According to the CSB final report, the Texas City disaster was caused by organizational and safety deficiencies at all levels of BP.  Warning signs of a possible disaster were present for several years, but company officials did not intervene to prevent it. The extent of the serious safety deficiencies were further revealed when the refinery experienced two additional serious incidents just a few months after the March 2005 disaster. In one, a pipe failure caused approximately $30 million in damage and in the other, there was approximately $2 million in property loss. In each of the incidents, community shelter-in-place orders were issued.

44.     The CSB report states, "Simply targeting the mistakes of BP's operators and supervisors misses the underlying and significant *cultural, human factors, and organizational causes of that disaster* that have a greater preventative impact. One underlying cause was that BP used inadequate methods to measure safety conditions at Texas City. *BP did not take effective steps to stem the growing risk of a catastrophic event."*  Some of the key organizational findings from the CSB final report found that cost-cutting, failure to invest and production pressures from BP Group executive managers impaired the process safety performance at Texas City. The BP Board of Directors did not provide effective oversight of BP's safety culture and major accident

prevention programs. The Board did not have a member responsible for assessing and verifying the performance of BP's major accident hazard prevention programs.

45.     OSHA enforcement at the BP refinery was also examined.  After the explosion at Texas City, OSHA uncovered 301 "egregious willful" violations for which BP paid a $21 million fine, the largest ever issued by OSHA..

46.     The Texas City refinery had a "check the box" mentality meaning the personnel would complete paperwork and check off on the safety policy and procedural requirements without even actually doing the checks and meeting the requirements.

47.     On December 9, 2005, BP issued its final incident investigation report on the Texas City disaster. In that report, BP claimed to improve safety not only at that refinery but throughout all of its operations.

48.     Ross Pillari, president of BP Products North America, Inc. stated that "[t]he report clearly describes the underlying causes and management system failures which contributed to the worst tragedy in BP's recent history. We accept the findings, and we are working to make Texas City a complex that attains the highest levels of safety, reliability and environmental performance."

49.     "We are creating an environment in which people know that what they say matters, that they know what is expected of them and that they will deliver what is expected of them," said Texas City site manager Cohn Maclean. "We must keep our promises to each other. It is the first step in rebuilding trust and the only way to earn the respect and obtain the commitment of a very skilled and very experienced workforce."

50.     A BP press release issued after the Texas City accident stated, "BP has accepted responsibility for the explosion and fire that occurred at its Texas City refinery on March 23,

2005. BP is deeply sorry for what occurred and for the suffering caused by its mistakes. BP is working to improve plant integrity, *safety culture and process safety management at all BP-operated facilities in order to prevent incidents like this in the future."*

51.     After the Texas City refinery incident, BP followed the recommendation of the U.S. Chemical Safety and Hazard Investigation Board and formed the BP US Refinery Independent Safety Review Panel to conduct a thorough review of the company's corporate safety culture, safety management systems, and corporate safety oversight. The Panel included such luminaries as James A. Baker, III, former U.S. Secretary of State and former Senator Thomas Slade Gorton Ill (R-Washington).

52.     In January 2007, the Panel issued a report, sometimes referred to as the "Baker Report," which stated that "BP's Group requirements are intended to ensure a consistent Group-wide effort to achieve BP's stated commitment toward 'no accidents, no harm to people, and no damage to the environment."

53.     After the Baker Report was released, Lord John Browne, the former CEO of BP, stated that "We will use this report to enhance and continue the substantial effort already underway to improve safety culture and process safety management at our facilities. . . **I intend to ensure BP becomes an industry leader in process safety management and performance."**

54.     As a result of the Texas City disaster, BP pleaded guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency. BP officers signed a settlement with federal safety inspectors vowing to institute improvements, but in 2009 the federal Occupational Safety and Health Administration ("OSHA") imposed an $87 million fine - the largest in its history - on BP for failing to correct the safety violations at the Texas City plant. OSHA also declared that BP had a "serious systematic safety problem."

55.     A 2006 shareholder derivative lawsuit in the aftermath of the Texas City refinery explosion resulted in a settlement in which BP agreed to incorporate changes to improve its safety record. BP did not follow through on its promises. BP's failure was not disclosed to BP shareholders.

### 2.     2006: Oil Leakage in Prudhoe Bay, Alaska

56.     In 2006, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline. BP had been warned to check the pipeline in 2002, but did not do so, only discovering four years later that a six-mile length of pipeline was hopelessly corroded. BP was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines.

57.     On October 25, 2007, BP pled guilty to a criminal violation of the Clean Water Act and U.S. District Court Judge Ralph Beistline sentenced BP to three years probation. Judge Breistline stated at that time that oil spills were a "serious crime" that could have been prevented if BP had spent more time and funds investing in pipeline upgrades and a "little less emphasis on profit." A Congressional committee later determined that BP had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations. The Prudhoe Bay incident and the Texas City disaster led to the resignation under fire of John Browne, BP's former CEO. BP again declared that it would change and improve on its safety.

### 3.     BP's Annual Filings on Form 20-F Tout Safety Measures Taken in Response to Past Incidents

58.     BP filed annual reports on Form 20-F's with the SEC.

59.     In BP's 2007 Form 20-F submission, it made the following representations regarding safety and risk management:

**Safety**

This section reviews BP's 2007 performance with respect to safety and the environment. An overview of our non-financial performance will appear in BP Sustainability Report 2007, expected to be published in May 2008.

In total, there were seven workforce fatalities relating to BP operations in 2007, compared with the same number in 2006. Two were the result of shootings relating to our retail operations in South Africa, two occurred in operations at our US refineries in Cherry Point and Texas City, one was on board a BP marine vessel, one was road-related and one an accident involving a defective fire extinguisher in Indonesia. We deeply regret the loss of any lives. These incidents re-emphasize the need for constant vigilance in seeking to secure the safety of all members of our workforce.

Our employee and contractor reported recordable injury frequency in 2007 was 0.48 per 200,000 hours worked, the same as that for 2006 (2006 data was corrected from 0.47 to 0.48), and below the industry average for 2006.

**Implementing Baker Panel recommendations**

Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery. We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 (see www.bp.com/bakerpanelreport).

We have made material progress throughout the group across all of the panels 10 recommendations. Action can be grouped under the following headings:

**Leadership**

Our executive team carried out site visits, which included BP's five US refineries. Board members also undertook site visits, including one to the Texas City refinery. We have consistently communicated that safe and reliable operations are our highest priority. Our safety and operations audit group was strengthened and completed 28 audits in 2007.

**Management systems**

Implementation of our operating management system (OMS) began at a first group of sites that included all five US refineries (see page 40). We continued implementing the groups six-point plan', which focuses on key priorities for investment and action associated with safe operations (see below).

### Knowledge and expertise

We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability. Specialists have been deployed at our US refineries to accelerate priority improvement programmes.

### Culture

**To reinforce the need for a stronger safety culture, our in-house team undertook assessments of BPs safety culture, supported by communication from leadership.**

### Indicators

Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. These include measures on the competency of employees in roles critical to safety and on the development of appropriate operating procedures. We are working with the industry to develop indicators and this already includes progress to agree a metric covering loss of primary containment.

### Progress at Texas City and our other US refineries

Across the US refining system, we have worked to address factors that contributed to the Texas City refinery incident of 2005, including facility siting, atmospheric relief systems, operating procedures and operator training, as well as control of work systems and process safety culture and leadership.

The refineries have engaged with employees on how to improve process safety. Each refinery is creating a strategic implementation plan to reduce process safety risk on a continuous improvement basis and to implement the OMS. With the United Steel Workers Union, we have reached agreement in principle to work jointly to improve safety across four represented refineries. At Texas City, face-to-face communication with staff has been supplemented by The Future is Now, a monthly magazine widely circulated across the group.

Approximately 640 new staff were hired across our US refineries, strengthening our support of engineering, inspection and process safety.

* * *

### Implementing the six-point plan

We set out our immediate priorities for improving process safety management and reducing risk at our operations worldwide through a six-point plan. This plan, launched in 2006, pre-dated the panel's recommendations and creates a foundation for our approach.

Progress on the plan's elements is reviewed each quarter by the executive-level group operations risk committee (GORC).

We have taken the following actions in relation to the six-point plan:

- In 2007, we implemented a group practice on occupied portable buildings and removed all temporary buildings out of high-risk zones in refineries and major onshore plants. We continue to apply the practice and report progress on identification and removal of relevant buildings to the GORC. A total of 17 blow-down stacks — all of those on heavier- than-air light hydrocarbon streams in refineries have been removed from service. The one remaining blow-down stack, at a chemical plant in Malaysia, is scheduled to be removed from service during 2008.

- We have completed 50 major accident risk assessments (MARs). The assessments identify high-level risks that, if they occur, would have a major effect on people or the environment. Many of these risks, such as a loss of containment from our operations, are common across the industry. Mitigation plans to manage and respond to identified risks form part of the MAR analysis.

- We are implementing group standards for integrity management and control of work on a locally risk-assessed and prioritized basis. Progress on implementing the standards is tracked quarterly. We have spent $6 billion on integrity management in the course of 2007, principally related to operating costs for maintenance and capital costs for plant improvement.

- We have continued to improve the way in which we seek to ensure our operations maintain compliance with health and safety laws and regulations. A project to establish a consistent compliance management framework has been under way in the US during the past two years and is expected to be completed globally by the end of 2008.

- Reviews have been undertaken resulting in many actions being closed out from past audits. Other actions requiring closure have been identified.

- Senior HSE advisors have carried out a preliminary assessment of the operational experience of BP management teams responsible for major production or manufacturing plant and any significant assessment findings have been addressed.

**Operational integrity**

As part of monitoring operational integrity, we track the number of major incidents during the year: oil spills of more than 100 barrels, significant property damage or fatal accidents related to integrity management failures. We also investigate any near-misses that could have resulted in a major incident. Overall in 2007, the total number of 'high potentials went down; however, more integrity management-related high potentials' were reported in 2007 than in previous years as a result of improved knowledge-sharing. The

number of oil spills of one barrel or more in 2007 decreased to 340 from 417 in 2006. The volume of oil spilled was 1.05 million litres, of which 0.33 million litres were unrecovered.

**Continuing to focus on personal health and safety**

In combination with our efforts to improve process safety, we have continued to strive for excellence in occupational health and safety. This is in line with our aspiration of no accidents, no harm to people and no damage to the environment.

Continued focus on driving risks has resulted in a significant reduction in major driving incidents, (those that cause a fatality or result in a vehicle rollover) since 2005.

Health is an integral part of the OMS. In 2007, work continued on developing practices in health management, covering industrial hygiene, asbestos, fitness to work, health impact assessment, medical emergency management, health promotion and wellness. These practices set minimum standards of health performance in BP (see below). We recognize that the health and safety of our workforce and communities is affected by our operations and that meeting our aspiration of no harm to people requires continuous effort, every day.

**Implementation of the OMS**

We began implementation of the OMS at 12 representative pilot sites. Learnings from these pilots will be used to assess and improve the OMS before widening its introduction. We intend for the whole of BP to have commenced use of the OMS by the end of 2010.

The OMS incorporates BPs principles for operating and provides a framework to help deliver competence, then excellence, in operations and safety. Standards for control of work and integrity management and detailed 'practices' in matters such as risk assessment provide further underpinning. Training and development programmes have been strengthened to develop the right capability and culture across the organization.

As described by BP's group chief executive, the OMS "is the foundation for a safe, effective, and high-performing BP. It has two purposes: to further reduce HSE risks in our operations and to continuously improve the quality of those operations". The system's 'elements of operating' describe eight dimensions of how people, processes, plant and performance operate within BP. A continuous improvement process drives and sustains improvement of these elements at a local level.

**Capability development**

We have initiated development programmes designed to ensure that BP has the capability among its people to achieve operational excellence and identify and manage risks.

The programmes support implementation of the OMS by developing technical knowledge and skills. They seek to improve management, behavioral, cultural and leadership skills to drive and sustain multi-year change in operations across multiple geographies.

For instance, the operating essentials programme is tailored to staff in maintenance, operations and safety who have responsibility for managing front-line employees and contractors. We completed operating essentials pilots in Anadarko (North America gas), Angola and Kwinana and started the first phase of the implementation at 11 other sites.

The Operations Academy, provided in partnership with the Massachusetts Institute of Technology, is directed towards senior operations and safety leaders of sites or large units.

The executive operations programme targets group vice presidents and senior business leaders with accountability for multiple operations or sites. Its purpose is to deepen insight into manufacturing and operations activities and the consequences of leadership decisions.

In 2007, we began the development of programmes for the wider workforce such as technicians and operators, graduate new hires and managers in roles between supervisory and senior leadership levels.

**4.      BP's Other Safety Lapses**

60.      There were other incidents, some of which contributed to Browne's resignation as CEO of BP. For example, according to reports, Browne was personally implicated by a high-level BP employee as being involved in a multimillion dollar criminal bribery scheme to unlawfully influence government officials in nearby Azerbaijan. Les Abrahams, who had led BP's successful bid for oil rights in Azerbaijan stated publicly that line item expenditures on BP's books were not what they seemed. According to Mr. Abrahams, BP allocated a budget of £45 million to cover costs for Azerbaijani operations which involved alcohol and prostitutes. According to Mr. Abrahams, "The BP officials would come out to Baku in groups of five or six, every week. Sometimes I would charter an entire Boeing 757 to carry as few as seven staff. Their main base was the hard currency bar of the old Intourist hotel - - so named because it accepted only dollars and was only open to foreigners. It was full of prostitutes and many of us, including me, used them on a regular basis, although we quickly established they all worked for the KGB."

Similar allegations were raised alleging that BP was involved in bribing government officials in Kazakhstan for oil rights.

**C.     BP Abuses Its Relationship With MMS**

61.     When current CEO Defendant Anthony Hayward took office in 2007, he promised to change BP's culture, with a renewed commitment to safety.

62.     He represented that his first priority was "focusing like a laser on safe and reliable operations." In an interview before his announcement as CEO, he described how the death of a worker who was on an operation he was leading in Venezuela shaped his opinion. Defendant Hayward stated that, "I went to the funeral to pay my respects. At the end of the service his mother came upon and beat me on the chest. 'Why did you let it happen?' she asked. It changed the way I think about safety. Leaders must make the safety of all who work them their ***top priority.***"

63.     The record shows this promise was an empty one, as Hayward and BP have led the company on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures. While aggressively seeking to grow and expand, BP was also implementing "draconian" methods of keeping costs down, including failing to provide extra safety measures to prevent a tragedy like the *Horizon* explosion. Regardless, BP ignored safety and environmental concerns.

64.     In 2007, BP was cited for inadequately training employees in well control in a scenario that was very similar to what transpired on the *Horizon* on April 20, 2010. In addition, the *Horizon* was badly burned by an accidental fire in 2005 while under contract with BP. In May 2008, the accidental opening of a valve flooded the *Horizon* with seawater, causing very

substantial damage. This information was not disclosed to shareholders in any of BP's public statements.

65.    A rule change enacted in 2008 by the U.S. Minerals Management Service ("MMS") allowed BP to avoid filing a plan specifically for handling a major spill from an uncontrolled blowout at its *Horizon* project - exactly the kind of disaster now unfolding in the Gulf of Mexico. According to reports, improper benefits were given by BP to the Interior Department so that BP could cut costs in its oil drilling and production operations in the Gulf of Mexico.

66.    MMS, an arm of the Interior Department, oversees the United States' natural gas, oil and other mineral resources. The 1,700-employee agency collects and distributes more than $13 billion per year in revenues from federal leases for offshore and onshore drilling. It also enforces laws and regulations that apply to drilling operations.

67.    Oil rig operators generally are required to submit a detailed "blowout scenario." However, MMS issued a notice in 2008 that exempted some drilling projects in the Gulf under certain conditions. According to the documents it filed with the government, BP claimed to have met those conditions and as a result, the oil company had no plan written specifically for the *Horizon* project.

68.    In 2009, when the MMS proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years, BP lodged a formal objection.

69.    Moreover, BP actively opposed MMS's rules requiring oil rig lessees and operators to develop and audit their own safety and emergency management plans, insisting that voluntary compliance would suffice and that BP would put safety at the forefront of its

operations. In 2009, BP spent $16 million lobbying the federal government on a wide variety of issues, including encouraging the government to remove restrictions on drilling on the continental shelf. BP fought for these government changes despite its history of spills and explosions and BP's knowledge of the high risks involved in such drilling.

## DEFENDANTS MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

70.    Beginning on March 4, 2009, BP began to highlight its operations in the Gulf of Mexico as one of its primary economic drivers, hyping the fact that it was one of the largest deepwater operators in the world. At the same time, BP failed to disclose that its Gulf of Mexico operations were exceedingly risky and that the Company was dangerously exposed financially due to its deficient safety procedures.

71.    On March 4, 2009, BP filed with the SEC its 2008 Form 20-F which included representations on safety and risk management such as:

**Safety**

This section reviews BP's safety performance in 2008.

There were five workforce fatalities in 2008, compared with seven in 2007. One resulted from fatal injuries sustained during operations at our Texas City refinery; one was the result of a fall from height at the Tangguh operations in Indonesia; one fatality was on a land farm near Texas City, and two were driving fatalities incidents in Mozambique and South Africa. We deeply regret this loss of life. By learning from these incidents and implementing appropriate improvement actions, we continue to seek to secure the safety of all members of our workforce. Our workforce reported recordable injury frequency, which measures the number of injuries per 200,000 hours worked, was 0.43 in 2008. This was a good improvement on the rate of 0.48 recorded in both 2007 and 2006.

Throughout 2008, senior leadership across the group continued to hold safety as their highest priority. Site visits, in which safety was a focus, were undertaken by the group chief executive (GCE) and members of the executive team to reinforce the importance of their commitment to safe and reliable operations.

**Management systems**

We continue to implement our new operating management system (OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.

When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. It embraces recommendations made by the BP US Refineries Independent Safety Review Panel (the panel), which reported in January 2007 on safety management at our US refineries and our safety management culture.

The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis. BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve driving efficiency and reliability. A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated businesses plan to transition to OMS by the end of 2010. Eight sites completed the transition to OMS in 2008; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska. Implementation is continuing across the group and a number of other sites, including all refineries not already operating the OMS, are expected to complete the transition in 2009.

For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators. A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk management. Each site also develops a plan to close gaps that is reviewed annually. The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively. Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

We are on track to meet our target of implementing OMS across the group by the end of 2010.

\* \* \*

**Process safety management**

We remain fully committed to becoming a recognized industry leader in process safety management and are working to achieve this. We have taken a range of steps, including acting on the recommendations from both the panel and those within the first annual report of the independent expert.

Our actions can be summarized in three principal areas:

- We have made progress in reducing process safety risk at our US refineries. For example, we have completed and learned from safety and operations audits, relocated workers to lower-risk accommodation and implemented fatigue reduction programmes.

- Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008.

- Many of the process-safety related improvements recommended by the panel are being implemented across the group through the OMS. The group essentials within the OMS (which cover diverse aspects of operating activity including legal compliance, process and environmental safety and basic operating practices) in some cases go beyond the panel's process safety recommendations, a point noted by the independent expert in his first report.

In addition to action in these areas, we have continued to participate in industry-wide forums on process safety and have made efforts to share our learning with other organizations.

The independent expert has been tasked with reporting to the board on BP's progress in implementing the panel's recommendations. We welcome the independent expert's view expressed in his first report (May 2008) that BP appears to be making substantial progress in changing culture and addressing needed process safety improvements'. However, we also acknowledge his observation that 'a significant amount of work remains to be done on the process safety journey' and that 'successful completion of the task will require the continued support and involvement of the board, executive management, and refinery leadership along with a sustained effort over an extended period of time'. The independent expert's second report is expected in the first half of 2009.

**Operational integrity**

We continue to implement the six-point plan launched in 2006 to address immediate priorities for improving process safety and minimizing risk at our operations worldwide.

We have met our commitment to remove occupied portable buildings (OPBs) from high-risk zones within onshore process plant areas and to remove all blow-down stacks in heavier-than-air, light hydrocarbon service. All major sites and our fuels value chains have completed major accident risk assessments, which identify major accident risks and develop mitigation plans to manage and respond to them.

We continue to implement the Control of Work and Integrity Management standards. We have made progress in ensuring our operations meet the requirements of a group framework designed to ensure we stay in compliance with legal requirements on health and safety. We are continuing to take steps to close out past audit actions. Leadership competency assessments, which involve assessment of the experience of BP management teams responsible for major production sites or manufacturing plant, have been completed in Exploration and Production and in all major Refining and Marketing manufacturing sites.

Implementation of these actions is expected to be largely complete by the end of 2009, with some aspects of implementation being incorporated into the transition to the OMS, expected to be completed by the end of 2010. The GORC regularly monitors progress against the plan.

We monitor and report separately on major incidents such as those covering fatal accidents, significant property damage or significant environmental impact. We also track and analyze 'high potential' incidents — those that could have resulted in a major incident. All major incidents and many high-potential incidents are discussed by the GORC and we continue to seek to learn as much as possible from each incident.

A total of 2l major incidents were reported in 2008. Two of the major incidents were related to hurricanes and eight were related to driving incidents.

There were 335 oil spills of one barrel or more in 2008, similar to 2007 performance of 340 oil spills. The volume of oil spilled in 2008 was approximately 3.5 million litres, an increase of 2.5 million litres, compared with 2007. This was largely the result of two incidents, one at Texas City and one at the Whiting refinery, which accounted for two-thirds of the total reported volume of oil spilled, the great majority of which remained contained and the oil recovered.

**Performance indicators**

We have well-developed systems, processes and metrics for reporting personal safety and environmental metrics that support internal performance management as well as public reporting.

We introduced several new metrics in 2008 that aim to enhance our monitoring of process safety performance within BP's operating entities. These include, for example, a process safety incident index, as recommended by the panel, which uses weighted severity scores to record and assess process safety events, and a measure to record any loss of hydrocarbon from primary containment.

Our indicators include industry-aligned 'lagging' process safety metrics that register events that have already occurred, and 'leading' indicators that focus on the strength of our controls to prevent undesired events in future. A suite of indicators is regularly reported to the GORC within the quarterly 'HSE and Operations Integrity Report' and several new metrics have also been piloted. To further enhance the management of health risks across the group, we began the systematic reporting of recordable illness rates within the HSE and Operations Integrity Report. We continue to work with industry bodies such as the Centre for Chemical Process Safety and the American Petroleum Institute on the development of process safety metrics, definitions and guidance.

**Continuing to focus on health**

In addition to our efforts to improve process safety performance, we strive to protect the personal health and safety of our workforce, recognizing that healthy performance is delivered through healthy people, healthy processes and healthy plant.

In the course of 2008, we defined health 'group essentials', which specify requirements designed to prevent harm to the health of employees, contractors, visitors and local communities. These were incorporated within the OMS framework. Our health strategy and plan was also refreshed in 2008. Priorities include reducing significant occupational exposure and infectious disease risks, maintaining robust regulatory compliance in product health and safety and addressing the issue of fatigue management raised by the panel by providing training and awareness-raising.

72.     In June of 2006, the Senate Energy and Natural Resources Committee passed a major energy bill (S. 1462) that included a provision to lift a 2006 moratorium on oil and gas drilling in the eastern Gulf of Mexico, including the gas-rich Destin Dome area.  On November 19, 2009, David Rainey, Vice President for Gulf of Mexico Exploration for BP America, Inc. (a subsidiary of BP, plc) appeared before the committee, and stated that advances in technology had enabled the industry to reduce the occurrence of oil spills and other environmental consequences

of offshore drilling. Rainey also stated that developments over the last 50 years have made it easier to protect the environment. While Rainey acknowledged the general risks of drilling for oil in the Gulf of Mexico, he omitted the fact that BP had not implemented adequate safety provisions, and therefore was highly exposed to operational risks in the Gulf of Mexico.

73.     In addition, Rainey provided a written statement prior to that Senate committee hearing which included the following statements regarding BP's energy portfolio:

**BP's Energy Portfolio**

BP is not only the largest oil and gas producer in the United States, but also the largest investor in energy of all sorts. In the last five years, we have invested approximately $35 billion in the US to ensure Americans have the energy and fuels they need to live their lives. These include:

**Oil and natural gas:** Offshore and onshore, from the Alaskan North Slope to the deep waters of the US Gulf of Mexico, we are a leader in providing America's traditional energy needs.

74.     In discussing safety specifically, Rainey stated:

**While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.**

75.     The representations were false and misleading.  Rainey omitted to state what BP knew, i.e. that BP's safety protocols were woefully inadequate to protect the public, its employees and the environment from an incident like the *Horizon* disaster.

76.     On February 26, 2010, BP issued its 2009 Annual Review.  The Annual Review included a letter from Chairman of the Board Carl-Henric Svanberg, stating "Risk remains a key issue for every business, but at BP it is fundamental to what we do.  We operate at the frontiers of the energy industry, in an environment where attitude to risk is key.  The countries we work in, the technical and physical challenges we take on and the investments we make – these all demand a sharp focus on how we manage risk.  We must never shrink from taking on difficult

challenges, but the board will **strive to set expectations of how risk is managed and remain vigilant on oversight**."

77.     This statement is not true.  The reality was that BP was trying to manage risk in the most cost-effective means possible, meaning that they were prepared to put its employees, the public and the environment at substantial risk in order to save money on such items as a back-up blowout preventer at the *Horizon*.  If BP had truly been willing to put safety first, it would have complied with safety standards and reduced safety risks necessary to prevent a disaster like the Deepwater Horizon incident.

78.     In the 2009 Annual Review, Defendant Hayward wrote, "Despite these difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on *safe and reliable operations.*"

79.     Defendant Hayward acknowledged that BP was operating on the frontiers of the energy industry, but then falsely reassured investors that risks were being handled appropriately, "BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to maximize returns over the long term. *We continue to show our ability to take on and manage risk, doing the difficult things that others either can 't do or choose not to do.* This is why we are able to form such strong relationships with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs."

80.     In a section entitled "Sustaining momentum and growth," BP acknowledged that its safety protocols are material to investors by including a separate section on safety entitled "Safety, reliability, compliance and continuous improvement." That section states:

"**Safe, reliable and compliant operations remain the group's first** priority. A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, **OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.**"

81.     In BP's 2009 Annual Review, Defendant Inglis, BP's Chief Executive of Exploration and Production reiterated BP's claim that safety was BP's primary focus:

> "*Safety, both personal and process, remains our highest priority.* **2009 brought further improvement in personal safety with the** segment's reported recordable injury frequency improving from 0.43 in 2008 to 0.39 in 2009.

> We also achieved improvements in the number of process safety-related incidents and a significant reduction in the number of spills.

> During the year we continued our migration to the BP operating management system (OMS), which provides an increased focus on process safety and continuous improvement. By the end of 2009, 87% of our operating sites had transitioned to OMS."

82.     Defendant Inglis went on to reaffirm BP's purported "Deepwater Expertise" stating that, "BP is the leading operator in the deepwater Gulf of Mexico. We are the biggest producer, the leading resource holder and have the largest exploration acreage position. Thunder Horse is now the largest single producing field in the Gulf of Mexico. Fully operational and performing beyond expectations, it has enabled us to grow our Gulf of Mexico production from 240,000 barrels of oil equivalent per day in 2007 to more than 400,000 barrels of oil equivalent per day in 2009."

83.     These representations were false and misleading. After the Deepwater *Horizon* disaster, it became apparent that BP had been operating in an unsafe manner, particularly with respect to its deepwater Gulf of Mexico operations critical to BP's financial results. The truth was that safety was not BP's first priority. Rather, BP's failure to implement and enforce

appropriate safety measures made a costly and deadly incident like the *Horizon* a virtual inevitability.

84.    On March 2, 2010, BP published and made a PowerPoint presentation in London which highlighted its deepwater operations, especially in the Gulf of Mexico.  BP highlighted its safety record. BP's first point is **that Safe and reliable operations remains #1".**



85.    The presentation was false and misleading. While it is true that the Gulf of Mexico was an important economic driver for BP, it is <u>not true</u> that BP was focused on safety. Instead, a cascade of failures by BP made an incident like the *Horizon* disaster virtually inevitable. No lessons were learned from the past.

86.    In fact, BP concealed the fact that BP's engineers predicted a catastrophic disaster of this nature. According to recent reports, BP also owned a rig known as Atlantis that operated

with incomplete and inaccurate engineering documents, which one BP official warned could "lead to catastrophic operator error." Engineering documents - covering everything from safety shutdown systems to blowout preventers - are meant to be roadmaps for safely starting and halting production on the huge offshore platform. In an **August 15, 2008 e-mail** that was never revealed to the shareholders, a BP project manager stated that, "The current procedures are out of date." In discussing whether or not to provide incorrect documentation, the project manager states that, "This could lead to ***catastrophic operator errors*** due to their assuming the drawing is correct."

87.     Ken Abbott, a BP consultant hired to advise on operations on the Atlantis oil rig told BP that critical blueprints and drawings needed to safely operate the Atlantis had not been reviewed or approved by BP engineers. According to Mr. Abbott, 89% to 95% of the blueprints that are critical to BP's operation of the Atlantis had never been reviewed or approved. According to Mr. Abbott, the culture at BP was shockingly lax towards safety. When Mr. Abbott raised the issue of safety with senior BP managers, he was criticized, isolated and later dismissed by BP. Mr. Abbott's concerns were never revealed to the shareholders of BP. This information is material since accidents, such as the Texas City disaster and the *Horizon* disaster, have a significant impact on BP.

88.     Even in the aftermath of the *Horizon*, BP has publically stated that their other operations remain safe and that *Horizon* was merely an isolated incident. From the evidence revealed to date, BP's push for speed over safety was the primary cause of the *Horizon* explosion. BP's representation that safety was the most important priority was false. It appears now that inadequate safety mechanisms at the Atlantis oil rig make another catastrophic incident likely. The Atlantis, operating a short distance away from the *Horizon*, intends to install a total of

sixteen oil wells. An accident at the Atlantis would dwarf the catastrophe of the *Horizon*. Until the *Horizon* incident, all of this information had been concealed by BP.

89.     In February of 2010, two months before the *Horizon* disaster, 19 members of Congress called on the agency that oversees offshore oil drilling to investigate a whistle-blower's complaints about the Atlantis, which is stationed in 7,000 feet of water more than 150 miles south of New Orleans. The Atlantis operates in the same region as the *Horizon* and there is evidence that BP's general approach to safety in the Gulf of Mexico was seriously flawed.

90.     According to the Associated Press, an independent firm hired by BP substantiated the complaints in 2009 and found that the giant petroleum company was violating its own policies by not having completed engineering documents on board the Atlantis when it began operating in 2007. Stanley Sporkin, a former federal judge whose firm served as BP's ombudsman, said that the allegation "was substantiated, and that's it." This study was never disclosed to shareholders and was not revealed until after the *Horizon* disaster.

91.     In January of 2010, Karen Westall, an attorney for BP, wrote a letter to Congress saying the company is compliant with all federal requirements and the Atlantis has been operating so safely that it received an MMS award. This statement was false and misleading. University of California, Berkeley engineering professor Robert Bea describes running an oil rig with flawed and missing documentation as like cooking a dinner without a complete recipe. According to Mr. Bea, "This is symptomatic of a sick system. This kind of sloppiness is what leads to disasters."

92.     On March 5, 2010, BP issued its 2009 Form 20-F Annual Report. BP stated in a section entitled "Outlook" that "Our priorities remain the same - ***safety, people and performance, focusing on the delivery of safe, reliable and efficient operations***. In 2010, we

aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, *while ensuring we maintain our priorities of safe, reliable and efficient operations."*

93.     In discussing the Gulf of Mexico, BP specifically stated:

"BP applies high resolution seismic data for the identification of reservoir extent and fluid contacts only where there is an overwhelming track record of success in its local application. In certain deepwater fields, such as fields in the Gulf of Mexico, BP has booked proved reserves before production flow tests are conducted, in part because of the significant safety, cost and environmental implications of conducting these tests."

94.     BP's operations in the United States take place in three major areas: the deepwater Gulf of Mexico, the lower 48 states and Alaska. BP acknowledges the deepwater Gulf of Mexico is easily its largest area of growth in the United States. The report specifically stated:

**Deepwater Gulf of Mexico**

Deepwater Gulf of Mexico is our largest area of growth in the US. In addition, we are the largest producer and acreage holder in the region.

Significant events were:

•   In May 2009, BP announced it had begun production from the Dorado (BP 75% and operator) and King South (BP 100%) projects. Both projects are subsea tiebacks to the existing BP Marlin Tension Leg Platform (TLP) infrastructure. Dorado comprises three new subsea wells located about two miles from the Marlin TLP. King South comprises a single subsea well located 18 miles from the Marlin TLP. Both projects leverage existing subsea and topsides infrastructure and the latest subsea and drilling technology to enable the efficient development of the fields. Dorado utilizes dual completion technology enabling production from five Miocene zones and King South is produced through the existing King sub sea pump.

•   In June 2009, the Atlantis Phase 2 (BP 56%) project achieved first oil ahead of schedule, signaling the official start-up.

•   In July 2009, BP announced the drilling of a successful appraisal well in a previously untested southern segment of the Mad Dog field (BP 60.5% and operator). The 826-5 well is located in the Green Canyon block 826, approximately 100 miles south of Grand Isle, Louisiana, in about 5,100 feet of water. The results from this well

continue the successful phased development of the Mad Dog field and build upon the success from 2008.

- In September 2009, BP announced the Tiber discovery in the deepwater Gulf of Mexico (BP 62% and operator). The discovery well, located in Keathley Canyon block 102, approximately 250 miles south-east of Houston, is in 4,132 feet of water. It was drilled to a total depth of approximately 35,055 feet making it the deepest oil and gas discovery well ever drilled. The well found oil in multiple Lower Tertiary reservoirs. Appraisal will be required to determine the size and commerciality of the discovery.

95.    Again, these representations were false and misleading. While touting the Gulf of Mexico as one of the critical areas of growth, BP omitted the fact that its operations in the Gulf of Mexico were unsafe and that it had unlawfully sought to manipulate regulatory agencies into allowing it to conduct operations in the Gulf of Mexico in a low cost, high risk manner. The truth, as revealed by the cascade of systematic failures that resulted in the *Horizon* disaster, shows that the above-mentioned statements were false. BP **did not** have in place a mechanism for conducting operations in a safe and reliable manner, which made an incident of this nature virtually inevitable. These facts were not disclosed.

96.    BP's 2009 Form 20-F also included the following representations:

**Safety and operational performance**

In 2009, BP's safety record continued to improve, as indicated by measures of personal safety including reported recordable injury frequency (RIF) and days away from work case frequency (DAFWC).

Our overall RIF of 0.34 was significantly lower than the rate of 0.43 in 2008 and 0.48 in 2007. Our DAFWCF was 0,069, an improvement on the level of 0.080 in 2008.

In 2009, eight work-related major incidents were reported, compared with 21 in 2008. Major incidents include incidents resulting in fatalities, significant property damage or significant environmental impacts. All fatalities and other major incidents and many that have the potential to become major incidents, are discussed by the group operations risk committee (GORC), chaired by the group chief executive. Our mandatory internal requirement to undertake incident investigations seeks to ensure that we learn as much as possible from each incident and take action to prevent re-occurrence.

There were 234 oil spills of one barrel or more reported in 2009, a significant reduction on the 335 spills that occurred in 2008. The reported volume of oil spilled in 2009 was approximately 1,191 million litres, a reduction of 65% compared with 2008.

This performance follows several years of intense focus on training and procedures across BP. BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.

**Safe, reliable and responsible operations**

Having been introduced at eight operating sites in 2008, implementation of the OMS gathered pace in 2009. The system was up and running at 70 operations across the business by the end of the year, including all our operated refineries and petrochemicals plants. This represents around 80% of the operations for which OMS implementation is planned, with the remainder scheduled to be live by the end of 2010.

Taking a systematic approach is integral to improving safety and operating performance in every BP site. Our OMS covers all areas from process safety, to personal health, to environmental performance. By applying consistent principles and processes across the BP group's operations, the system provides for an integrated and consistent way of working. These principles and processes are designed to simplify the organization, improve productivity, enable consistent execution and focus BP on performance.

\* \* \*

**Process safety management**

We continued to implement the 2007 recommendations made by the BP US Refineries Independent Safety Review Panel (Panel), which following the incident at Texas City in 2005, reviewed process safety management at our US refineries and our safety management culture.

 In accordance with those recommendations, we appointed an Independent Expert for a five-year term to monitor their implementation. We again co-operated closely with the Independent Expert in 2009, providing him access to our sites, personnel and documentation and routinely supplying him with progress reports. In the Independent Expert's second annual report, published in 2009, he acknowledged BP's sustained focus on its safety and operations agenda and the priority given by executive management and the board to safe, reliable and responsible operations. The report identified areas for continued focus and highlighted the progress made in several areas, including the development of capability programmes, OMS implementation, safety and operations auditing, and the improvement of metrics to monitor process safety performance. During the course of 2009, we also provided regular progress updates to the Safety, Ethics and Environment Assurance Committee of the board.

See Legal proceedings on pages 95-96 in respect of ongoing Texas City refinery matters.

By the end of 2009 our safety and operations audit team had audited a total of 94 BP businesses, including all major operating sites, within a three-year period. The audits, which in 2009 included pilot audits for analysis against the requirements of the OMS, have provided a rigorous process for assessing our businesses against BP's relevant standards and requirements.

We also participated in industry-wide forums on process safety. We chaired the API/ANSI multi-stakeholder group developing a standard for public reporting of leading and lagging process safety indicators. Through this and other bodies, we shared our learning with other organizations within and outside the oil and gas industry.

**'Six-point plan'**

Our efforts on process safety included taking action to close out our six-point plan for process safety, which was launched in 2006 to address immediate priorities for improving process safety and minimizing risk at our operations worldwide. We have either completed the required actions or integrated the few continuing requirements within the OMS, for tracking to completion. We established a clear approach for future monitoring of these within the internal HSE & Operations Integrity Report. This report, which is the key source of management information relating to safety and operations in BP, is prepared quarterly for the GORC.

97.     BP's statements in its 2008 and 2009 Form 20-F Annual Reports were false and misleading or omitted material facts necessary to make other statements not misleading. While highlighting the rewards of its Gulf of Mexico operations, BP actively hid the risks and dangers, the failure to implement appropriate safety measures, and its abdication of appropriate risk management.

**Defendants Concealed Repeated Warnings Associated With Its Drilling Operations**

98.     BP's reckless and undisclosed inattention to safety and maintenance issues culminated in the *Horizon* disaster. Like the Texas City disaster and others, BP had ample warning of problems and ignored them.

99.     The risks of offshore drilling were well known to BP and are especially high in the Gulf, where floating rigs are used, unlike the permanent rigs used in other areas such as the

North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to serious accidents.

100.   At the time of the disaster, the *Horizon* was not producing any oil. The *Horizon* had drilled a well in the sea floor and was in one of the last phases of the exploratory operation prior to turning the well into a production well. In this final phase, Halliburton workers on the *Horizon*, under the supervision and control of BP's employees, were attempting to create a cement seal to plug off the wellhead. BP's employees under the supervision and control of one or more of the BP Defendants had authority over the Halliburton workers to determine the type and amount of cement to be used.

101.   According to one of the survivors of the *Horizon*, BP had known about potential problems on the *Horizon* for months prior to the accident. The survivor informed *60 Minutes* that BP had initially estimated work to take 21 days (3 weeks). However, as the time for setting up the latest well extended to 6 weeks, BP managers became agitated and ordered workers to speed up the schedule. An earlier problem with the well that later exploded had cost BP $25 million. BP managers told this to the workers on the oil rig in order to pressure them to speed up work in order to make up that loss. The *Horizon* survivor told *60 Minutes* that BP was always pressuring them to do their work quickly but when the timeline for the *Horizon* well extended into 6 weeks and with the loss of $25 million in an earlier incident, BP managers ordered the drillers to speed up the rate of penetration. In other words, BP told the drillers to work faster.

102.   Approximately four to five weeks prior to the *Horizon* incident, chunks of the annular on the blowout preventer had broken off and floated to the surface. The annular is a critical part of the blowout preventer used to ensure that explosive gas does not escape to the surface. BP also knew in the weeks and months prior to the incident, but did not disclose

publicly, that the battery on the blowout preventer was weak and one of the control pods on the blowout preventer was broken. According to engineering expert Robert Bea, he described the malfunctioning control pod as "like losing one of your legs."

103. While this information was known to BP in the weeks and months leading up to the *Horizon* disaster, BP officials were publically representing to shareholders that it would be able to deliver strong growth in the company in a safe and reliable manner. For example, at a March 22, 2010 Howard Weil Conference in New Orleans, Defendant Hayward stated that:

> "We are currently planning to make final investment decisions for 24 new major projects in the next two years. Each project has been high- graded through our project selection and progression process. They are **concentrated in the Gulf of Mexico, the North Sea, Azerbaijan and Angola - high-margin production areas that improve the portfolio and enable profitable growth."**

> **"Safety and operational integrity underpins everything we do, and** we **are** now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance. And I am pleased to say that in 2009 we saw continuing improvement in all aspects."

104. At a March 25, 2009 Howard Weil Conference in New Orleans, Defendant McKay stated:

> "You are investing in your future."

> "There's no better example of what technology can do than the deep waters of the Gulf of Mexico."

> "By the way, let me add that managing costs **down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant** in the years ahead.

> **"Safety will continue to have first call on the company resources."**

105. BP's atrocious approach to safety was never disclosed to Plaintiff and the investing public, a fact that would have been material in making informed investment decisions.

106.    Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout or an uncontrolled release of oil and/or natural gas from the well. Indeed, BP knew that the work being performed at the *Horizon* was especially risky.  In 2007, MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the *Horizon* was doing when it exploded.

107.    According to a *60 Minutes* report, based on interviews with a survivor of the *Horizon* and the government's expert tasked with investigating the *Horizon* disaster, BP issued orders that greatly heightened the risk of a disaster. These orders were issued by senior BP managers. BP knew that it was operating in a dangerous formation in which extra safety precautions were required, not less. Immediately before the disaster, BP ordered that the drillers begin extracting the mud from the well before all of the concrete plugs were put into place. This would speed up the process but meant that pressure in the well would be highly unstable. According to Robert Bea, if the mud had been left in place, the *Horizon* accident would likely not have occurred. Nevertheless, with a broken blowout preventer, BP ordered a dangerous procedure be performed that jeopardized the workers on the *Horizon*, the public and the environment. This directive was given by BP in order to save money. The results were catastrophic.

108.    Not only did the blowout preventer on the *Horizon* fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail. Worse, BP failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

109.    First, BP consciously elected not to install an acoustically activated remote-control shut-off valve, costing only $500,000, to the well. Indeed, such acoustic switches are mandated in countries like Brazil and Norway, and are employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of BP and other oil companies.

110.    Second, BP chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor. BP ignored these precautions despite being well aware of the increased risk of a failure of the primary blowout safety mechanism, the blowout preventer, from deep-sea operators.

111.    Over ten years ago, the MMS sent out an industry-wide safety alert ordering companies drilling in deep water in the outer continental shelf to have effective backup systems. The March 2000 notice stated: "The MMS considers a backup [blowout preventer] actuation system to be an essential component of a deepwater drilling system, and therefore expects OCS operators to have reliable back-up systems for actuating the [blowout preventer]."

112.    MMS, however, left it up to the individual companies to decide what kind of backup system to use. BP chose the cheapest method, electing not have a backup system for activating the blowout preventer on the *Horizon*.

113.    BP's direction of the completion operations of the well, in particular the installation of the final cement casing at the wellhead prior to the conclusion of the exploratory phase of the well, was carried out by Halliburton and BP with extreme recklessness. As the *New York Times* reported on May 3, 2010:

> More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well - a possible factor that could have contributed to the explosion.

*     *     *

The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily. BP planned to return to the well later to set up a permanent rig and start producing oil.

Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks.

The concrete involved is highly specialized. It needs to be blended and stirred properly. It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal.

The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said. But idling a rig to address such a problem can cost huge sums... [L]awyers said that supervisors either missed or ignored the signals and proceeded with the job.

When workers released the last valves that were holding back the natural gas that had built up inside the well, the gas shot up the pipe and sprayed into the drilling rig, igniting the fireball that caused the deaths of 11 workers, injured others and sank the rig . . .

114.     Employees working on the *Horizon* experienced recurring problems with pockets of highly flammable natural gas forcing its way up the drilling pipes. Prior to the *Horizon* incident, BP did not view these incidents as problematic, but instead stated that the gas was likely to only create a "negligible" risk. The government, however, cautioned the company that gas buildup was a genuine concern and that BP should take note and "exercise caution." In the weeks leading up to the *Horizon* incident, so much natural gas rose to the surface that an emergency announcement called for a stop to all "hot work," meaning any welding, cooking or any other use of fire or igniters. Smaller emissions of gas also slowed work at the Rig on other occasions too.

115.     Despite the dangers posed by the extreme gas build up, BP allowed Halliburton to employ a risky technique of mixing nitrogen gas into the cement to create a mousse-like

compound. Employees on the *Horizon* have suggested that workers were motivated to finish early in order to earn bonuses for finishing the job ahead of schedule.

116.    The *New York Times* has also reported that: "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said the rig had been drilling deeper than 22,000 feet, even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep…"

117.    The *Horizon was* connected to the wellhead on the seal floor by a 5,000-foot pipe called a riser. As the *Horizon* sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser bent into a crooked shape underwater, and now snakes along the ocean floor and in the deepest waters slightly above it. Oil is leaking from the open end of the riser and from three places along its length, including one location almost at the wellhead.

118.    BP's initial response to the Deepwater Disaster was lackluster and only intensified the damage.  After the explosion, BP attempted to downplay and conceal the severity of the oil spill. An initial leak estimate of 1,000 barrels (42,000 gallon) per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels (200,000 gallons) per day. Moreover, BP was slow and incomplete in its announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

119.    According to Representative Henry Waxman (D-Calif.), BP told the House Energy and Commerce Subcommittee on Oversight that the well that exploded had failed a key pressure test hours before the April 20, 2010 explosion. "Significant pressure discrepancies were observed in at least two of these tests, which were conducted just hours before the explosion,"

said Rep. Waxman, citing documents his committee had received from BP. According to Steven Newman, president of Transocean, and Lamar McKay, president of BP America, these pressure readings were worrisome. Despite these worrisome pressure readings, according to Rep. Waxman, "it appears the companies did not suspend operations, and now 11 workers are dead and the Gulf faces an environmental catastrophe." These problems are emblematic of a systemic and cultural failure (undisclosed to investors) at BP to disregard safety and risk management.

120.    The fire and explosion on the *Horizon*, its sinking and the resulting oil spill were a direct result of the inadequate safety protocols put into place by BP. If BP had adequately informed shareholders and the public of its poor safety records and procedures, such risk would have been appropriately priced into BP securities.

121.    The risks of offshore drilling are well known to BP. In fact, BP and the Individual Defendants were well aware that drilling at the depths that the *Horizon* was drilling at posed increased risks. Defendants knew that, in the Gulf of Mexico, it was appropriate to spend more money and adopt stricter safety procedures because of the heightened risks and dangers. Defendants, however, chose not to ignore such risks in order to cut costs. Defendants' behavior made an incident of this nature virtually inevitable, with the resultant costs. This was not disclosed to the investing public.

122.    While BP struggles to develop containment systems on the spot, thousands of barrels of crude oil are leaking into the Gulf of Mexico each day.  On May 10, 2010, BP Chief Operating Officer Doug Suttles for the first time publicly admitted that Company was woefully unprepared to mitigate the damage of the *Horizon* incident due to its location. Suttles stated, "There's a lot of techniques available to us. The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

### ADDITIONAL SCIENTER ALLEGATIONS

123.    Defendants had knowledge that the Gulf of Mexico was a key driver for BP. As the documents cited above show, many of which were signed or attested to by top officers and directors, BP had publically stated that new exploration in the Gulf of Mexico was critical to BP's growth and success and that it could achieve those results in a safe manner.

124.    However, Defendants also knew that BP had deep, systemic problems. This knowledge is shown by:

- Internal communications by project managers to senior staff in BP that, in the Gulf of Mexico, project managers and engineers were submitting out-dated information that violated BP's Code of Conduct and created a serious risk of a catastrophic disaster. This includes the April *15,* 2008 Duffy e-mail.

- In the months leading up the *Horizon*, BP not only knew about problems on the oil rig, it was BP senior managers who gave direct orders that put profit and speed before safety. Those orders arc one of the principal causes of the *Horizon* disaster. These facts were concealed and not disclosed to BP shareholders.

- The January 2007 Baker Report showed that there was a poor safety culture at BP. BP's officers and directors were made aware of systemic problems at BP and were aware that nothing was being done to correct them. The report acknowledged that "a **significant amount of work needed to be done"** and required the **"continued support and involvement of the board, executive management and** refinery leadership."

- Based on the January 2009 investigation from the Interior Department, BP knew that it and other oil companies had provided improper benefits to the MMS in order to manipulate it into reducing regulation, another issue that heightened safety risks.

- A January 14, 2010 letter from Representatives Stupak and Waxman raised serious concerns about BP's operations in Alaska. BP claimed that they were improving safety processes throughout the company but the reality was that the company was not doing so.

- BP senior management violated its own Code of Conduct by consciously electing not to install an acoustically activated remote- control shut-off valve on the *Horizon* at a cost of $500,000. Such a device likely would have prevented the *Horizon* disaster.

- A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of increased force. BP knew that better blowout preventers were needed for the *Horizon* but consciously chose not to install them.

- A 2000 MMS safety alert stated that all oil rigs operating in the continental shelf, such as the *Horizon*, should include a backup blowout preventer. BP senior management knew that none had been installed on the *Horizon*.

- BP knew that employees experienced recurring problems with pockets of highly flammable natural gas on the *Horizon*. BP knew that this was a huge risk but publically referred to this risk as "negligible" so it would not have to spend more money in an effort to prevent this risk.

- BP knew for weeks leading up to the explosion on April 20, 2010 that an emergency announcement had called for a stop to all "hot work." Nevertheless, under BP's direction, a high risk cementing technique was used. BP senior management knew of and authorized this work.

- BP knew that its federal permit only allowed it to drill from 18,000 to 20,000 feet and also knew that operations on the *Horizon* had gone down to at least 22,000 feet. BP knew that offshore drilling operations along the lines of those conducted by the *Horizon* were extremely high risk. Nevertheless, BP authorized breaking the federal permit limit without implementing improved safety measures.

- BP knew of previous problems on the *Horizon* but instead of improving safety on the oil rig, made efforts to further cut costs and ignore its policies.

## LOSS CAUSATION/ECONOMIC LOSS

125.    As detailed herein, during the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of BP's ADRs and operated as a fraud or deceit on Class Period purchasers of BP ADRs by misrepresenting the Company's risks, safety protocols, operations, business and prospects.   Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of BP ADRs fell precipitously, as the prior artificial inflation came out of the prices over time.   As a result of their purchases of BP's ADRs

during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## FRAUD-ON-THE MARKET DOCTRINE

126.   Plaintiff and the members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period.

- The omissions and misrepresentations were material.

- Plaintiff and other members of the class purchased BP ADRs between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted material facts.

- BP ADRs met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient market.

- As a regulated issuer of securities in the United States, BP filed Annual Reports on Form 20-F with the SEC. These reports were publicly available and could be and were reviewed by the investing public.

- BP ADRs was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace.

- BP regularly communicated with public investors via established market communication mechanisms, including regular publicly issued press releases that

were carried by national newswires and through other wide-ranging public disclosures, such as communications with financial press, securities analysts and other similar reporting services.

127.   As a result, the market for BP securities promptly digested current information with respect to BP from all publicly-available sources and reflected such information in BP's stock price. The price of BP ADRs moved in direct response to information regarding the company that was put out in the public marketplace. For example, the share price of BP ADRs dropped significantly after the explosion on the *Horizon* and the resulting discovery of BP's safety and risk management practices, Under these circumstances, all purchasers of BP ADRs during the Class Period, including Plaintiff, relied on the market price of BP ADRs and suffered similar injury through their purchase of these ADRs at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

128.   Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class comprised of all those who purchased the publicly-traded ADRs of BP during the Class Period and suffered damages thereby (the "Class").  Excluded from the Class are: (i) Defendants; (ii) the immediate family members of the Individual Defendants; (iii) any person who was an officer or director of BP or any of its parents or subsidiaries during the Class Period and members of their immediate families; (iv) any entity in which any Defendant had a controlling interest during the Class Period; (v) any parent or subsidiary of BP; and (vi) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

129.    The members of the Class are dispersed throughout the United States and are so numerous that joinder of all members is impracticable.  BP's ADRs were actively traded on the NYSE during the Class Period.   While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

130.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly suffered damages arising out of defendants' wrongful conduct in violation of federal law that is complained of herein.

131.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

132.    Common questions of law and fact predominate and include whether defendants: (i) violated the Exchange Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the price of BP ADRs during the Class Period and the extent of and appropriate measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

134.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements and material omissions pled in this Complaint.  Many of the statements alleged to be false and misleading were not specifically identified as "forward-looking statements" when made, and many were statements of historical fact and/or representations about the Company's then-existing condition to which the statutory safe harbor does not apply.

135.    To the extent any statements alleged to be false or misleading herein may be characterized as forward-looking to which the statutory safe harbor applies, (i) those statements were not accompanied by meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements knew in each case that their statements were false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

### CAUSES OF ACTION

### COUNT I.
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER
### (Against All Defendants)

136.    Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

137.    Throughout the Class Period, Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States Mails, interstate telephone communications and a national securities exchange, violated §10(b) of the Exchange Act and

Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BP ADRs during the Class Period.

138.   The Company and Individual Defendants, as the most senior officers of the Company, are liable as direct participants in all of the wrongs complained of herein.  Through their position of control and authority, the Individual Defendants were in a position to and did control all of the Company's public false and misleading statements and omissions.  The Company is liable for each of the statements of the Individual Defendants through the principles of respondeat superior.   As detailed above, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose of concealing the Company's true financial and operating risks from the public and supporting the artificially inflated price of the Company's common stock.

139.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BP's ADRs.  Plaintiff and the Class would not have purchased the BP ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

140.    By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the members of the Class who have been damaged as a result of such violations.

**COUNT II.**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against the Individual Defendants)**

141.    Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

142.    It is appropriate to treat the Individual Defendants and BP as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the BP public filings, press releases and other publications are the collective actions of the Individual Defendants and BP.

143.    The Individual Defendants acted as controlling persons of BP within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of BP's respective businesses and systematic involvement in the fraudulent scheme alleged herein, the Individual Defendants named herein each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of BP, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants named herein had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

144.    Each of the Individual Defendants named herein had direct and supervisory involvement in the operations of BP and, therefore, did have the power to control or influence the implementation of BP's risk management and safety procedures for its oil exploration and

production operations, including those that relate to the Deepwater Horizon disaster that give rise to the securities violations as alleged herein, and exercised the same.

145.    Each of the Individual Defendants named herein, by virtue of their high-level positions and participation in and/or awareness of BP's operations, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BP, including the content and dissemination of the various statements that Plaintiff contends are false arid misleading. The Individual Defendants were provided with or had unlimited access to copies of BP's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. BP controlled the Individual Defendants and all of its employees.

146.    As set forth above, the BP and the Individual Defendants violated Section 10(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of BP securities during the Class Period at inflated prices and the losses suffered when the value of their shares fell after the truth became known, representing the causal connection between Defendants' fraud and the damages suffered by Plaintiff and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Class, prays for judgment as follows:

1.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.     Awarding Plaintiff and all members of the Class damages against the defendants, jointly and severally, in an amount to be proven at trial;

3.     Awarding Plaintiff and members of the Class pre-judgment interest, as well as reasonable attorneys' fees and other costs;

4.     Awarding such other relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff, pursuant to Federal Rule of Civil Procedure 38, individually and on behalf of all others similarly situated, demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

Respectfully submitted,

WAITE, SCHNEIDER, BAYLESS &
 CHESLEY CO., L.P.A.
Stanley M. Chesley (Ohio Bar # 0000852)
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-0267
Facsimile: (513) 621-0262
E-mail: stanchesley@wsbclaw.com

W. Mark Lanier (TX Bar #11934600)
The Lanier Law Firm
6810 FM 1960 West
Houston, TX  77069
Phone:  (713) 659-5200
Facsimile:  (713) 659-2204

Dianne M. Nast (PA Bar # 24424)
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA  17601
Phone:  (717) 892-300
Facsimile:  (717) 892-1200

Camilo Salas, III (LA Bar #11657)
Salas & Co., L.C.
650 Poydras Street
Suite 1650
New Orleans, LA 70130
Phone:  (504) 799-3080
Facsimile: (504) 799-3085

Daniel E. Becnel Jr. (LA Bar #24567)
P. O. Drawer H
Reserve, LA 70084
Phone:  (985) 536-1186
Facsimile:  (985) 536-6445

Jerrold S. Parker, Esq. (NY Bar No. 1894666)
Parker Waichman Alonso, LLP
6 Harbor Park Drive
Port Washington, NY 11050
Phone:  (516) 466-6500
Facsimile:  (516) 466-6665


BY:  ____/s/Richard J. Arsenault_____
     Richard J. Arsenault (LA Bar #02563)
     NEBLETT, BEARD & ARSENAULT
     Post Office Box 1190
     2220 Bonaventure Court
     Alexandria, LA  71309-1190
     Phone:  (318) 487-9874
     Facsimile:  (318) 561-2591

     *Counsel for Plaintiff*